

**U.S. DEPARTMENT OF JUSTICE**

United States Attorney
Eastern District of California

Phillip A. Talbert
United States Attorney
Robert T. Matsui United States Courthouse
501 I Street, Suite 10-100
Sacramento, CA 95814

January 13, 2023

VIA ECF

Hon. Kimberly J. Mueller
Chief United States District Judge

    Re: *United States v. Khanna et al.*, 22-cr-00213-KJM

Dear Hon. Chief Judge Mueller:

    On January 10, 2023, the Court requested the parties to provide additional legal authorities and information to enable the Court to make its decision on the governmnet's motion to revoke bond and defendants NAVIN KHANNA ("N. KHANNA") and TINU KHANNA's ("T. KHANNA") motion for release.

    1. <u>Encumbered Property</u>

    According pretrial services, "As a general practice we would not recommend releasing someone on a property bond when there is a lien on the property." This is true even if there remains equity on the property for a variety of reasons. As the holder of the secondary lien, the government lacks visibility and control into the lien. May not be able to initiate foreclosure proceedings, and may even be forbidden from doing so. Even if the government is not barred from initiating foreclosure proceedings, the pace and timing would be controlled by the primary lien holder. Finally, the primary lien may increase, which would similarly be outside of the governments control (for example, yearly tax assessments, interest, fines, that could balloon the fully secured lien and dimmish or even completely erase the government's interest. In sum, the existence of a primary lien compromises the government's ability to enforce its own lien. A secondary lien would not be able to guarantee defendants' appearance because of the risk that the primary lien would engulf the remaining equity in the property or bar collection on the government's lien.

    The parties' citation to *United States v. Frazier*, 772 F.2d 1451 (9th Cir. 1985) does not hold otherwise. In that case, the Ninth Circuit took issue with the fact that the district court based its requirement that the property be unencumbered out of an improper concern for the government's ability to collect on its property interest. Here, however, the government's argument is that the strength of this surety to ensure defendants' appearance is markedly diminished because of the primary lien. This is an acceptable reason under *Frazier* and the Bail Reform Act to disallow or discount the value of a proposed surety.

    Regardless of the effect of the lien on the property, the Court in its discretion may not accept it if the Court "lacks confidence in the surety's purpose or ability to secure the appearance of a bailed defendant." *United States v. Nebbia*, 357 F.2d 303 (2d Cir. 1966). In *Nebbia*, the Appeals Court

noted that even $100,000 in cash might not guarantee a defendants' appearance, even if the collection of that monies was guaranteed. Indeed, a $1 million cash bond is not excessive if the flight risk is high. *United States v. Szott*, 768 F.2d 159 (7th Cir. 1985); *see also U.S. v. Stathakis*, 2007 WL 3124703 (2007) (defendant fled with $5 million bond, of which $3.5 million was secured by three properties). In *Szott*, the defendant was not a United States citizen (like T. KHANNA), the stakes of the case were high (as in this case, where defendants face the highest ss amount under Sentencing Guideline § 2B1.1) and defendant could easily flee to Canada (like N. KHANNA).

2. <u>Non-citizen Sureties</u>

In terms of work-visa holders co-signing on a bond, Pretrial does believe these individuals are suitable sureties (again this a practice, not a policy). While visa-holders have permission to be in the Unites States temporarily, they do not have permanent legal status or authorization to stay in the United States long-term. A work visa does not guarantee that the holder will remain here until end. It is a maximum period of time the bond could be enforced, not a minimum. Because the surety could return to India at any time, the potential co-signer may not be residing in the United States should the defendant willfully fail to appear in the future. Again, the issue here is the negligible persuasion that such a surety will have to ensure defendants' appearance when there is almost no possibility of enforcing this bond.

3. <u>The Badwalls' Property</u>

This property has not been reviewed by pretrial. At this point, it is not an appropriate surety to include in the current package. Furthermore, the government is highly concerned, based on reported conversations with pretrial services officers, that these and other sureties seem to be coerced or supported by "the family" into offering whatever bond will garner the release of the KHANNA brothers. Such sureties do not create the "moral suasion" necessary to ensure defendants' appearance. *See United States v. Batista*, 163 F. Supp. 2d 222 (S.D.N.Y. 2001) (discussing case law and factors for determining moral suasion of a surety).

4. <u>Indian Bank Account and Company</u>

Since the hearing, the United States has discovered that Nirmal Khanna is a partner in an Indian company and that company has an Indian bank account. See Exhibits A and B. These documents were found hidden away in a folder that otherwise contained health records for defendants' mother. The company, Global Exim Enterprises, seems to do similar work as DG AUTO – scrapping precious metals from cars. Its headquarters is in New Delhi, India. It has a bank account with Yes Bank in India. Nirmal Khanna is the sole signatory on that account. Because it is an Indian bank account, the United States cannot even know what the balance is or where the monies have come from without going through extradition processes. This foreign bank account significantly increases defendants' flight risk.

5.  <u>Over $22 Million in Missing Cash</u>

At the hearing, defense counsel indicated that defendants' profit margin from their business was approximately 2%. Recently, the government received the books and records from defendants' CPA, which seems to support this number. Further digging, however, revealed why this number is grossly inaccurate.

According to the DG AUTO Profit and Loss Statement, DG AUTO had $297,536,262 in total income. After subtracting Costs of Good Sold (COGS) of $290,828,047, the Gross Profit was listed as $6,708,215, which is roughly 2.25%.

According to the 2021 DG AUTO General Ledger, a portion of COGS consisted of cash withdrawals from the bank account(s) maintained by DG AUTO for "Catalytic Converter Purchases." Based on the government's preliminary review, it appears that these cash withdrawals were accepted by the CPAs as being all for the purchase of catalytic converters, as the total amount of cash withdrawals was included in COGS, and there appears to be no adjusting entry for any cash that was diverted elsewhere or used for other purposes. Thus, the profit was falsely diminished by included all cash withdrawals as expenses instead of just cash used to purchase catalytic converters.

During its investigation, the government obtained bank records for all relevant DG AUTO accounts. The government also obtained as well as invoices issued by DG AUTO to individuals and businesses for the purchase of catalytic converters. This included invoices in which DG AUTO paid for catalytic converters in cash. The difference is cash that is unaccounted for. (No property or vehicles were paid for in cash.)

From February 8, 2020 (the date DG AUTO began creating invoices through InvoiceASAP), through December 31, 2020, cash payments to customers totaled $32,696,001. During the time period, cash withdrawals from DG AUTO bank accounts totaled $35,916,685. Thus, in 2022, there was $<u>3,220,684</u> in unaccounted for cash.

In 2021, according to DG AUTO's invoices, DG AUTO paid a total of $47,544,152 to individuals and businesses in cash for catalytic converters. However, according to DG AUTO's bank records for 2021, cash withdrawals totaled $54,489,150. This leaves a discrepancy of <u>$6,944,998</u>.

Finally, from the beginning of 2022 to defendants' arrest (January 1, 2022 to August 27, 2022), DG AUTO records show that there was $33,084,571 in cash payments to customers. Over the same time period, there was $46,647,407 in cash withdrawals from DG AUTO bank accounts. Thus, the unaccounted for cash from the first 10 months of 2022 was $<u>13,562,836</u>.

In total, the unaccounted cash from less than three years totaled **<u>$23,728,518</u>**. Although $1 million was found in defendants' home, that leaves over $22 million that cannot be traced. It was not used for any of the property of vehicles already discussed in the pretrial report.

This significant amount of unaccounted for cash drastically increases defendants' flight risk. They are a private flight to the UK, India, or Canada away from avoiding appearance. It also suggests that, if there is any amount that would ensure defendants' appearance, it would be close to $22 million. *See Szott*, 768 F.2d at 159 ($1 million bond appropriate when offense involved $2.6 million that was unaccounted for).

                                                        Sincerely,

                                                        PHILLIP A. TALBERT
                                                        United States Attorney

                                    By:  *Veronica Alegría*
                                         VERONICA M.A. ALEGRÍA
Encl.                                   Assistant United States Attorney
cc: