1                 UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF CALIFORNIA

3                         --oOo--

4   UNITED STATES OF AMERICA,      )
                                   ) Case No. 2:22-CR-0213-KJM
5           Plaintiff,             )
                                   ) Sacramento, California
6           vs.                    ) January 9, 2023
                                   ) 1:14 p.m.
7   NAVIN KHANNA aka               )
    Lovin Khanna, et al.,          ) Re: Motion Hearing
8                                  )
                Defendants.        )
9

10                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE KIMBERLY J. MUELLER
11               CHIEF UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Plaintiff:      UNITED STATES ATTORNEY by
                            MS. VERONICA M.A. ALEGRIA,
14                          Assistant United States Attorney
                            501 I Street, Suite 10-100
15                          Sacramento, California  95814

16  For the Defendants      EISNER, GORIN, ESQS., by
    Navin Khanna and        MR. ALAN EISNER, ESQ.
17  Tinu Khanna:            16000 Ventura Boulevard, Suite 1000
                            Encino, California  91436
18
    Also Present:           Taifa Gaskins,
19                          Pretrial Services Officer
                            Monica Bentley,
20                          Pretrial Services Officer

21               MARYANN VALENOTI, RMR, CRR
                    Official Court Reporter
22                 501 I Street, Suite 4-200
                    Sacramento, CA 95814
23               mvalenotiRMRCRR@gmail.com
                       (916)930-4275
24
    Proceedings reported via mechanical steno - transcript produced
25  via computer-aided transcription

1       SACRAMENTO, CALIFORNIA, MONDAY, JANUARY 9, 2023

2                          --o0o--

3           (In open court.)

4           THE CLERK:  Calling criminal case 22-213, United

5   States versus Navin Khanna and Tinu Khanna.  This is on for a

6   motion hearing.

7           THE COURT:  Good afternoon.  Appearances, please, for

8   the Government.

9           MS. ALEGRIA:  Good afternoon, Your Honor.  AUSA,

10  Veronica Alegria on behalf of the United States.

11          THE COURT:  Good afternoon, Ms. Alegria.

12          I understand you are representing both defendants here

13  today, specially appearing for the other Mr. Khanna.

14          MR. EISNER:  Yes, I'm the attorney for Navin Khanna,

15  Your Honor, Defendant Number 1, and I'm making a special

16  appearance today for Mr. Kmeto, who has been previously

17  appointed to represent Tinu Khanna.

18          THE COURT:  All right.  Your name for the record.

19          MR. EISNER:  Alan, A-L-A-N. Eisner, E-I-S-N-E-R.

20          THE COURT:  Good afternoon, Mr. Eisner.  And Mr. -- is

21  it Navin or Lovin?  I understand you consider your name Lovin

22  Khann.

23          And Mr. Tinu Khanna.  So, Mr. Tinu Khanna, is it

24  acceptable to you for Mr. Eisner to stand in for your attorney

25  today?  Your attorney is affected by the weather.

1          DEFENDANT TINU KHANNA:  Yes, Your Honor.

2          THE COURT:  So with your permission, it's a special

3   appearance for today only?

4          DEFENDANT TINU KHANNA:  Yes, Your Honor.

5          THE COURT:  All right.  I'm considering both the

6   Government's motion to revoke release and the defense motions

7   for bail.  That's understood.

8          MS. ALEGRIA:  Yes, Your Honor.

9          MR. EISNER:  Yes, Your Honor.

10          THE COURT:  So, first, I do just want to give the

11   Government a chance to respond to one statement made in a

12   defense Declaration attached to Navin Lovin Khanna's Motion for

13   Bond, it's at ECF 80.  The Declaration is at 80-1, Pages 1 to

14   2.  The suggestion being that this Court wasn't fully informed

15   about the status of the matter in New Jersey, and after

16   Mr. Khanna had already been released, it was only then that the

17   Government sought a stay.  So I just want to give the

18   Government a chance to respond to that.

19          MS. ALEGRIA:  I'm looking at the Declaration, Your

20   Honor.  Which paragraph specifically are you referring to?

21          THE COURT:  Paragraph 8; 7 and 8.  Actually,

22   Paragraph 6, 7 and 8 can be read together.

23          MS. ALEGRIA:  Okay.

24          THE COURT:  The suggestion being the New Jersey

25   magistrate judge -- this is procedural.  I'm not certain it

1    affects the merits, but it's due process matters.  So that's

2    why I'm asking for a response.

3         The suggestion is the New Jersey judge denied the stay

4    as untimely because Mr. Khanna had already been released, so

5    untimely and moot.  Do I have that right, Mr. Eisner?  Is that

6    the defense's position?

7         MR. EISNER:  Well, I talked with Mr. Calcagni, who was

8    the attorney for Mr. Khanna on November 2 at his initial

9    appearance in New Jersey, and he recounted that he had a

10   detention hearing, just like in his Declaration, that the

11   defendants were granted bond, that the matter was adjourned,

12   that he was called after hours to participate in a hearing,

13   which he reluctantly did.  During that hearing the Government

14   requested that the magistrate stay the order of bond.  The

15   judge denied that stay and the defendants were released on that

16   bond the next day.

17        THE COURT:  On the next day.  All right.  Then I have

18   the chronology wrong.  All right.

19        MS. ALEGRIA:  I'm not certain --

20        THE COURT:  I thought the New Jersey judge in part

21   said the motion for stay was untimely.  Do I misunderstand?

22        MR. EISNER:  Well, when -- when -- my recollection --

23   Mr. Calcagni's Declaration is the best memory of it.  The

24   Government did not ask for a stay at the detention hearing.

25   They discussed matters after the hearing.  It then was brought

1    back before the magistrate.  The magistrate heard the issue of

2    staying the bond that evening or later that day, and the judge,

3    after reconsidering the matter, said, No, I'm not going to stay

4    the order.  I'm going to accept my original decision of the

5    release on bond.

6         When I reviewed the Government's application for a

7    stay, and -- well, first of all, the issue of the stay, my

8    understanding is that they had been released already or had

9    been released that night.  But regardless of whether they were

10   or weren't, it wasn't presented in the Government's motion for

11   revocation or stay, that the matter had been or that the matter

12   of the stay was considered by the magistrate judge, and I agree

13   with Your Honor there might be a technical issue, it might not

14   affect the merits, but my point was exactly that.  This is a

15   due process issue.

16        The defense and the defense attorney didn't have an

17   opportunity to address that at the time, and when I say

18   "address that at the time," didn't have an opportunity to

19   address the Government's under-seal application to Your Honor

20   to reissue a no-bail hold out of this jurisdiction for the

21   defendants who were in New Jersey.  The defendants were

22   released on that bond and were --

23        THE COURT:  I understand all of that.  So it's this

24   issue, and in part, maybe it's on the Court, but the suggestion

25   also is this Court was not fully informed about everything that

1    had transpired in New Jersey.  So again, I just want to give

2    you a chance to respond because it does raise a serious

3    question about at least whether or not this Court was fully

4    informed at the time it was considering whether or not to issue

5    a stay.

6            MS. ALEGRIA:  My understanding, and I was not in New

7    Jersey, so I only understand this via a third-party that was

8    the New Jersey AUSAs who handled this.  My understanding is

9    there was a detention hearing, and then I am not quite sure the

10   order of events, but also there was a hearing on whether or not

11   the bond should be stayed or the release order should be

12   stayed.  I do not know -- and that was denied, but I do not

13   know when defendants were released.  I filed my order as soon

14   as I learned that that -- as soon as I could after I learned

15   that that had been denied.

16           Then my understanding --

17           THE COURT:  After the stay there had been denied?

18           MS. ALEGRIA:  Yes.  And then I learned -- I believe by

19   the time Your Honor had signed the order, they had been

20   released.  I'm not sure how many hours were in between that

21   time period, but to say that they did not have a chance to

22   address it is incorrect because by the time they were

23   re-arrested, they also came again before the magistrate judge

24   in New Jersey.

25           So they did have further proceedings, and I believe

1   Your Honor has multiple instances of records from Pretrial

2   Services in New Jersey.  So they were brought again before the

3   New Jersey court.

4           THE COURT:  At that point there might have been an

5   Oklahoma warrant.  I think that's the Oklahoma warrant.

6           Here's the bottom line:  It's really, really

7   important, regardless of whatever else I decide here today,

8   that the Court be fully informed, particularly if it's being

9   asked to make an ex parte request.  I'm not -- I just want to

10  reinforce that point.

11          There's no motion in particular asking me to do

12  anything further, but I am taking note of what's in the

13  Calcagni Declaration at 80-1.  It does raise a red flag.

14          One reason that we're into January on this hearing is

15  I was prepared to proceed in December, but then the defense

16  motion came in.  So for one reason or another, it's taken a

17  while for this to get before me, but I think, practically

18  speaking, in New Jersey, even if this court should have waited

19  or should not have issued the stay of this court, there was the

20  Oklahoma warrant, and so the Khannas would have been rearrested

21  in any event.  Do you concede that, Mr. Eisner?

22          MR. EISNER:  I concede that, Your Honor, yes.  But my

23  point is, though, that the defendants were released.  The

24  Government disagreed with that.  The Government presented Your

25  Honor with a series of circumstances and facts about the case

1     without the -- under-seal, without defense attorney being able

2     to respond, and the prosecutor was not fully candid about what

3     transpired in New Jersey with respect to the stay.  I will go

4     no further.  That's all.

5          Your Honor should have been told, Hey, Your Honor, I

6     did request the stay.  The Oklahoma Court, they did request the

7     stay, and they were advised that the stay was not accepted in

8     New Jersey and that was told to the Federal District Court in

9     Oklahoma.  So it was told to him.  It should have been told to

10    you, Your Honor.

11         THE COURT:  I understand that's your position.  I'm

12    not making any findings, but the fundamental point is correct,

13    and I'll look with greater care at future ex parte requests.

14         Second question:  Is there an understanding between

15    this district and the Oklahoma district; is there a case that

16    takes precedence?  Who is taking the lead on the prosecution?

17         MS. ALEGRIA:  This district is taking the lead, Your

18    Honor.

19         THE COURT:  All right.  Have you ever said that,

20    Mr. Eisner?

21         MR. EISNER:  "Taking the lead," meaning this case

22    comes first, and I have endeavored to contact the Oklahoma

23    prosecutors, but yes, I don't disagree with that.

24         THE COURT:  All right.  That's not this Court's call,

25    but to the extent that there are competing detention decisions

1     or other courts thinking about detention, I just wanted to get

2     clear on that.

3          I think it's this Court that -- based on what I'm

4     understanding as confirmed here today, this Court has the

5     primary jurisdiction over the detention question.

6          MR. EISNER:  I agree with that.  Nonetheless,

7     regardless of what happens here, Your Honor, I understand they

8     still would be detained, and I would need to go before an

9     Oklahoma judge --

10          THE COURT:  If I release.

11          MR. EISNER:  Well, I anticipate -- whether they were

12     released from here and went there, or whether they were

13     transported over there, I will endeavor to get them a bond

14     hearing, which is their right in Oklahoma.

15          THE COURT:  Understood.  Again, it's not for the Court

16     to manage the case, but to the extent it can be managed

17     efficiently to save judicial resources and any marshal

18     resources, that would appear to be in the public interest.

19          So with that, I'm turning to the merits.

20          What I'd like to do is I think both motions could be

21     considered at the same time.

22          MS. ALEGRIA:  Agreed, Your Honor.

23          THE COURT:  And really treat this as a reopened

24     detention hearing.  You would agree with that, Ms. Alegria?

25          MS. ALEGRIA:  Yes, Your Honor.

1          THE COURT:  Any objection, Mr. Eisner?

2          MR. EISNER:  No, I don't.  I agree.

3          THE COURT:  All right.  So it's open.  It's open for

4    all purposes.  So I have reviewed -- I'm assuming the parties

5    have seen the Pretrial Services Reports out of this district,

6    including the supplemental reports, one for each defendant.

7    Mr. Eisner, you have seen those?

8          MR. EISNER:  Yes, I have.

9          MS. ALEGRIA:  Yes, Your Honor.

10         THE COURT:  All right.  So let me start with Mr. Navin

11   Khanna, "Lovin Khanna" as he prefers.  The Government argues

12   the weight of the evidence being strong.  The weight of the

13   evidence is the least significant factor at this point given

14   the presumption of innocence, even though someone could be

15   detained based on flight risk and dangerousness considerations

16   without disturbing the presumption of innocence.

17         The Government now argues danger.  The Government did

18   not argue danger before, but it is now that the hearing is

19   reopened arguing danger as well, correct?

20         MS. ALEGRIA:  Correct, Your Honor.

21         THE COURT:  All right.

22         MR. EISNER:  Your Honor?

23         THE COURT:  Yes.

24         MR. EISNER:  I have not been given notice of that or

25   been given information about that.  Is there a document; is

1  there --

2          MS. ALEGRIA:  It's in the Government's motion.

3          THE COURT:  Yes.  Wait for me to call on people.

4          Docket 17.  I thought you had responded to that.

5  Isn't it Docket 17?

6          MR. EISNER:  If it's been previously addressed, yes.

7  I thought that there was something new that the Government

8  presented.

9          THE COURT:  I don't think there's anything new.  I

10  think there's the economic danger argument, but there is also a

11  suggestion -- which I thought the defense had responded to --

12  that this kind of operation, which is allegedly incentivizing

13  the theft of catalytic converters in bulk leads to street

14  crime, engagement with Mexican cartels, that's the argument.

15  You've read that argument?

16          MR. EISNER:  Yes.

17          THE COURT:  So I just wanted to clarify that the

18  Government is making that argument, and the pretrial services

19  officer does address that, that relies primarily on flight

20  risk.

21          Here's the bottom-line question:  Based on the

22  Pretrial Services Report, which has gone into great detail very

23  carefully investigating, talking to those persons willing to

24  post bonds, whether secured or unsecured, there is a very

25  modest amount of secured bond that the pretrial services

1   officer finds acceptable, and this is as to each defendant.

2   There are two people that may be appropriate, and the Court

3   finds no reason to question the pretrial services officer's

4   conclusions based on the detail included in the report.

5       Many of the folks offered to sign secured and

6   unsecured bonds either are close family members living in the

7   same house, employees who may be witnesses and/or beholden to

8   these defendants.  And so to the extent the defense wants to

9   argue that the pretrial services officer has it wrong in

10  assessing what's truly properly available to support a bond,

11  that's the Court's primary focus.

12      MR. EISNER:  All right.  May I address some of those

13  concerns?

14      THE COURT:  Yes.

15      MR. EISNER:  First, Your Honor, regarding danger, I

16  will note that I'm looking at the transcript of the detention

17  hearing on November 2, 2022 on Page 24.

18      THE COURT:  I saw that, but the Government did not

19  rely on danger at the first hearing in New Jersey, correct, but

20  now the hearing is reopened.

21      MR. EISNER:  Right.

22      THE COURT:  It's reopened for all purposes, and the

23  Government has just said it's relying on danger.

24      MR. EISNER:  I understand.  My position is that

25  nothing has changed from before November 2, when the defendants

1    were granted bond, until November 2 when they -- when they were

2    granted bond.

3            THE COURT:  I understand that position.

4            MR. EISNER:  Nothing factually has changed, nothing

5    legally has changed.  To now change the grounds for detention

6    to include danger, I would say is a bit Monday-morning

7    quarterbacking.

8            THE COURT:  I understand that argument.

9            MR. EISNER:  Not only that, in the pretrial report on

10   Page 19, Pretrial Services is not aware of any information

11   which indicates he presents a danger to the community.  So to

12   the extent the pretrial department weighed in on that, they

13   concluded that there's not a dangerous issue.

14           THE COURT:  While expressing a concern in Mr. Lovin

15   Khanna's case about alcohol consumption, that might mean

16   behavior in driving.

17           MR. EISNER:  I understand, and that's what appropriate

18   conditions of Pretrial are meant for, to have no alcohol use,

19   no driving without permission, to have alcohol treatment.

20   That's a concern that can appropriately be addressed by a

21   condition.

22           I would note, Your Honor, there were multiple search

23   warrants recovered in this case, and to my review of the case,

24   there were no firearms recovered in any of the searches.  So

25   that's also an issue that goes to danger.

1          THE COURT:  Let's assume, for sake of argument, that

2     I'm not concerned about danger.  So it's the bond.

3          MR. EISNER:  I understand.  I'm moving forward to the

4     sureties, which was your question, and thank you for indulging

5     me in that.

6          Your Honor, I acknowledge that there are seven of the

7     11 sureties that should not be considered by the Court.  There

8     are people who don't know the defendants until recently.  They

9     know him as an employee.  Those are not appropriate sureties.

10    But there are appropriate sureties that were provided to

11    Pretrial, which, first of all, that Pretrial thought were

12    appropriate sureties, Kamaljit Badwal, he is present in court,

13    Your Honor.  And while I'm on it, I would like to tell Your

14    Honor that the defendant's wife is present in Court,

15    Ms. Amandeep Khanna.  Ms. Anita Khanna, his mother, is in

16    Court.  His father is in Court, Mr. Nirmal Khanna.  Mr. Michael

17    Khanna, his older brother, is present in court, and they've

18    traveled from New Jersey, Your Honor.  Mr. Kamaljit Badwal, his

19    brother-in-law, is present in Court, and his -- and Mr. Tinu's

20    significant other is also present in Court, Ms. Krishma Pashar.

21         But we're talking about sureties, and Michael Khanna,

22    who's present in Court today, is willing to put up his primary

23    residence, Your Honor.  He doesn't own any other properties.

24         THE COURT:  Let's assume I've read all of that

25    information.  It's your response to the problems that Pretrial

1   Services identifies.  So Kamaljit Badwal, yes, acceptable

2   surety, assuming I accept Pretrial Service's conclusion, but

3   not having yet heard finally from the Government.  And then

4   also Ms. Tyagi.  Those are the two, correct?

5            Officer Gaskins is present.

6            Those are the two Pretrial Services has assessed based

7   on its professional experience and understanding.  Those two

8   are acceptable.

9            What is your response to the concerns raised about

10  Michael Khanna?

11           MR. EISNER:  Well, my concern -- well, my disagreement

12  with Pretrial is this, Your Honor:  They find that he's not a

13  qualified surety, and his home is not proper to be posted as a

14  bond because there is a lien on the home for some 20- or

15  $30,000.

16           There's been an appraisal of the property.  Pretrial

17  has assessed the property in the value of $539,000.  There is a

18  loan of about -- between the loan and the lien, it's about

19  $220,000.  There is still $319,000 of equity in that home

20  that's available to post.  There's nothing legal -- there's

21  nothing prohibiting a home from being posted just because it

22  has a lien, a debt on it.

23           THE COURT:  Practically speaking, it could interfere

24  with the ability to access the equity particularly if they are

25  tax liens.

1    MR. EISNER:  Well, if a home is sold, there is a tax

2  lien for $20,000, and there's still over $300,000 in equity

3  available to be posted with the Court.  If the Court posts --

4  requires the defendant to post the $200,000 bond that's

5  security by collateral, I don't see how a tax lien interferes

6  with the sale of the property for the Government to collect

7  $200,000 on that.  There's nothing legally prohibiting it for

8  the pretrial department to make an assessment that it's not

9  appropriate.  It's not suitable.  Again, I just repeat, there's

10  nothing legally preventing it from being posted as certain

11  collateral, especially when there's -- just doing the math --

12  still over $300,000 in equity.

13    Your Honor, I'll add, that's his entire, you know,

14  nest egg.  He's been in the home for over 15 years.  The

15  property on Zillow, he estimated the property as $700,000.

16  Maybe that was a little optimistic.  The pretrial department

17  estimated it as $539,000.  There's still over $319,000 in

18  equity on it, even including a tax judgment or a lien on it.

19    THE COURT:  What about the prior bankruptcy filing; is

20  there anything to prevent a new bankruptcy filing?  He withdrew

21  the prior filing.

22    MR. EISNER:  Well, a bankruptcy filing -- he's here,

23  Your Honor.

24    THE COURT:  I understand that.

25    MR. EISNER:  I believe that there would be a legal

1  preclusion for him to file bankruptcy and to interrupt in any

2  way the Government's attempt to obtain a $200,000 judgment on

3  that property.  I mean, I'm not a bankruptcy expert, but --

4       THE COURT:  Is there case law on the liens question?

5  Put aside the bankruptcy for now.  Is there case law addressing

6  the presence of tax liens on the property and the suitability

7  of the property for supporting a secured bond?

8       MR. EISNER:  Your Honor, that's a good question.

9       THE COURT:  So there was a fourth person you believe

10 is a suitable surety.

11      MR. EISNER:  Sapna Jolly, Your Honor.  The pretrial

12 department has opined that she is not a suitable surety because

13 of her immigration status.  Your Honor, she's here on a work

14 visa.  She's here on a work visa to be here for at least the

15 next three years.  She's here legally.  She's living here with

16 her husband.  Her income has been verified.  She plans to seek

17 permanent residence status here.  I respectfully disagree with

18 Pretrial that a person like that is not a responsible, reliable

19 surety.  She's made the attempts to come to this country

20 lawfully and legally to work here.  She's got a particular visa

21 that allows her to work here, which is not easy to get.  She

22 must have some special skill.  Her income has been verified.

23 I've talked to the defendant's father here.  She's known the

24 family for her lifetime.  I simply have a respectful

25 disagreement with Pretrial that she's not a responsible,

1    suitable surety.

2         THE COURT:  And then Mr. Badwal, although he does own

3    a home, he's not willing to post it to secure a bond.  He's

4    willing to post $100,000 per brother, unsecured; right?

5         MR. EISNER:  Right, Your Honor.  Again, he is here in

6    court.  He's come here from Massachusetts.  He's a United

7    States citizen.  He's had the same employer for the last 18

8    years.  He's a network engineer by trade.  He's both

9    defendants' brother-in-law.  He's married to Amandeep's -- I'm

10   sorry, he's Amandeep's brother.

11        Your Honor, I asked him about that, What about your

12   home?  His home is in a trust, Your Honor.  He has children.

13   He's preserving -- he was concerned that there was a concern

14   over posting a home that was in trust.  A promise to the Court

15   that he would pay a hundred thousand dollars on behalf of his

16   brother Tinu and a promise to the Court that he would pay a

17   hundred thousand dollars for his brother Navin is not

18   insignificant, Your Honor.  I just think it's a significant

19   statement.  He didn't come here today on a whim.  This is

20   important for the whole family, and it's been traumatic for the

21   whole family.

22        You know, their sons and brothers and wives have been

23   in custody for the last two months having never spent a day in

24   jail in their entire lives before November 2.  That's another

25   factor that Your Honor can look at.

1          THE COURT:  I understand that.

2          Talk to me about Ms. Tyagi, and particularly looking

3    at the information in the pretrial services report about the

4    back and forth where she appeared to modify her --

5          MR. EISNER:  She --

6          THE COURT:  Let me finish.

7          MR. EISNER:  Sorry.

8          THE COURT:  She modified her position after checking

9    with other persons perhaps raising a question about where the

10   backing is coming from, so that's one.  If you can address the

11   narrative in the paragraph about her saying she needed time to

12   think, and then came back, well, 85,000 unsecured; 42,500 each.

13         MR. EISNER:  First of all, I discounted -- when I saw

14   that back and forth, I discounted her as a surety as well.  A

15   surety needs to be willing to jump in front of a train for

16   their -- for the person who they're posting funds for.  So a

17   reluctance or a concern or a back and forth with Pretrial, like

18   the husband didn't want to post, I would take her off the list.

19         THE COURT:  Who's the fourth, then?

20         MR. EISNER:  I have Kamaljit, Sapna and Michael.  I

21   have those three.

22         THE COURT:  So that's three?

23         MR. EISNER:  Yes.

24         THE COURT:  All right.  So what does that mean per

25   defendant?  Is that approximately 250 per defendant,

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

1    assuming Michael Khanna -- just assuming, for sake of argument,

2    that it's -- well, 2- to 300,000 available for him to post.

3            MR. EISNER:  I would ask that he post a property bond

4    in the amount of 250, that's secured by $250,000, and in

5    addition for each defendant, Kamaljit post $100,000 for Navin

6    and a hundred thousand for Tinu.  So it would be, I suppose,

7    325 going to each one with 125 being secured by property.

8            THE COURT:  So Sapna Jolly is a hundred thousand per?

9            MR. EISNER:  Yes, that's what I thought she said.

10           MS. ALEGRIA:  I believe it says a hundred thousand for

11   both, Your Honor.

12           THE COURT:  That's what I'm reading.  I thought it was

13   50 per.

14           MR. EISNER:  Okay, I'm sorry.  Let's say two, three --

15   so 550 total.

16           THE COURT:  275 per.

17           MR. EISNER:  275 per.

18           THE COURT:  All right.  That at least clarifies.  That

19   is less than what the New Jersey magistrate had said.  Someone

20   signed a $500,000 unsecured bond, I gather.  Was the bond ever

21   signed in New Jersey?

22           MR. EISNER:  Your Honor, the bond was -- they did it

23   differently in New Jersey.  It was unusual to me, Your Honor.

24   They were in the process of perfecting the bond, getting people

25   who were willing to sign promises to the Court to support the

1    $500,000 figure.

2         THE COURT:  All right.  Before I ask the Government to

3    respond, for Pretrial Services, I don't know if you are

4    prepared to respond to this question, but in your mind have you

5    identified a number that would be sufficient if there were

6    adequate bond resources?  Is there a dollar figure given the

7    nature of this case in your experience that would be applying

8    the same rules to these defendants as we do to any other

9    defendant who comes before us?

10        PRETRIAL SERVICES OFFICER GASKINS:  Taifa Gaskins

11   speaking on behalf of Monica Bentley.

12        I don't think we thought of a number, Your Honor.  I

13   do know that we had discussions with our superiors about a

14   point that I would bring up now, if it's okay with Your Honor.

15        THE COURT:  All right.

16        PRETRIAL SERVICES OFFICER GASKINS:  Which is that we

17   did not believe at Pretrial that it -- we would not recommend

18   that the individuals cosign on unsecured bonds or post property

19   for both defendants at the same time.  We thought that if -- we

20   asked them if they would be willing to do it for both

21   defendants, but if we were making a recommendation, the one

22   thing that we did talk about was that we did not feel that, for

23   example, Ms. Jolly should sign on both bonds, but do one or the

24   other, but not both.

25        The property specifically was proposed to Pretrial

1    Services for Mr. Michael Khanna.  Mr. Michael Khanna's property

2    was proposed for Navin Khanna, not necessarily for Tinu, but he

3    said he would do it for both of them and that was how we

4    approached speaking to all of the proposed sureties, Your

5    Honor.  But we did not discuss a number that we would be

6    comfortable with, and that was in part because to another point

7    that was brought up earlier during the proceedings.  The New

8    Jersey magistrate did not have all the information.  The New

9    Jersey report was much less detailed than our report was.

10            THE COURT:  I've reviewed them all.  That's fair.  And

11   besides, the hearing is reopened with very complete information

12   it appears now.

13            PRETRIAL SERVICES OFFICER GASKINS:  They made that

14   decision about the $500,000 unsecured bond proven by one person

15   based upon the information they had versus we had a much more

16   vast amount of financial information we're dealing with.

17            THE COURT:  Yeah, I agree with that.  The point being,

18   the same person should not cosign for one as cosigns for the

19   other.  It recognizes the underlying potential conflict of

20   interest?

21            PRETRIAL SERVICES OFFICER GASKINS:  Correct.  That's

22   why we didn't have Mr. Falgiano, who's already cosigned on a

23   bond in New Jersey, be considered as somebody who would cosign

24   for one of the Khanna brothers.

25            THE COURT:  Got it.  Let me hear from the Government

1    in response to what you have heard about the three:

2    Mr. Badwal, Mr. Khanna, Ms. Jolly.  Any argument in response

3    from either of the defense, and then does the Government -- is

4    there a certain amount if there were appropriate sureties, a

5    combination of secured and unsecured, that the Government would

6    consider sufficient here?  I'm focused just on the bond issue.

7    Separate question about Mr. Tinu Khanna's immigration status,

8    but just focus on the bond right now.

9            MS. ALEGRIA:  Thank you, Your Honor.  Focusing just on

10   the bond and what has been addressed so far in the hearing, the

11   Government does not believe that any of these three individuals

12   would be appropriate sureties.  As Pretrial identified, Michael

13   Khanna's property is not suitable because it has a lien against

14   it.  That is Pretrial's determination.  Pretrial knows better

15   than I do, I believe, what it would entail if there's a lien on

16   the property and how difficult it would make it.  So I believe

17   Pretrial when they say it's not suitable because it would be

18   too difficult.

19           Regarding the unsecured bond from Michael Khanna, the

20   Government does not believe that Michael Khanna would be an

21   appropriate surety particularly in light of what has been

22   occurring since the defendants' arrest.  It appears that

23   Michael Khanna and the father Nirmal Khanna have been using

24   Michael Khanna's company as well as a company owned by Nirmal

25   Khanna to seemingly continue the operations of DG Auto and pay

1   DG Auto employees.  It also seems that --

2          THE COURT:  But there are no charges.

3          MS. ALEGRIA:  There are no charges.

4          THE COURT:  The suggestion is that they're trying to

5   keep a business going and to pay employees.  There's nothing to

6   suggest it's unlawful in what I see.

7          MS. ALEGRIA:  No, not -- I'm sorry, Your Honor.  I do

8   not know, Your Honor, I guess is the short answer to that, but

9   it is concerning.

10         I also don't believe that Ms. Jolly is a suitable

11   surety, and as Pretrial identified, she has a work visa that

12   expires in a couple of years, and, you know, she can return to

13   India at anytime.

14          THE COURT:  Is there case law the Government's

15   thinking of on both the liens question with respect to Mr.

16   Khanna's house and Ms. Jolly's?

17          MS. ALEGRIA:  I have not done the legal research.  If

18   Your Honor would like further briefing on this matter or this

19   issue, I'm happy to engage in that.

20         Then, Your Honor, regarding Mr. Badwal, I think it is

21   telling, and I think that defense counsel actually identified,

22   if there is reluctance or concern, they're not appropriate

23   sureties.  Now, Mr. Badwal, according to Pretrial, has not yet

24   put the home into a trust.  He is in the process of putting the

25   home into a trust.  So it is technically still available, but

1    he is not willing to sign over to secured bond, and as Your

2    Honor identified, in some ways this is similar to the very

3    concerning discussion that Pretrial had with Ms. Tyagi.  It

4    seems that it's possible that the family is helping to fund

5    these bonds; these bonds that are only for $50,000 or a hundred

6    thousand dollars.

7              THE COURT:  Well, you've now strayed from Mr. Badwal.

8              MS. ALEGRIA:  Yes, Your Honor.

9              THE COURT:  There is no suggestion of that with

10   Mr. Badwal, who has a home, has a good job.

11             MS. ALEGRIA:  Well, Your Honor, the issue there is

12   similar, and it's that he is only willing to do unsecured

13   bonds, not a secured bond on his home for a hundred thousand

14   dollars.

15             Now, you asked about what number is sufficient.

16   Certainly a hundred thousand dollars, $200,000, $300,000 is

17   nowhere near sufficient given the vast amounts of money that

18   have been flowing through these defendants' bank accounts every

19   week, every month.

20             THE COURT:  So does the Government have information

21   on -- the Defense says, Well, all the identified accounts are

22   seized.  The businesses are defunct.  So what supports the

23   conclusion that money is being diverted in a way that's

24   available to these defendants?

25             MS. ALEGRIA:  Your Honor, I would like to address

1  that.  First, I would like to address a lie or a misstatement

2  that Defendant Lovin Khanna told Pretrial.  He told Pretrial,

3  and this is in the Pretrial Services Report, that he made

4  approximately $50,000 gross per week.

5           THE COURT:  This is in the most recent Pretrial

6  Services Report?

7           MS. ALEGRIA:  Yes, Your Honor.

8           THE COURT:  Continue.  I'm just checking that as I

9  listen.

10          MS. ALEGRIA:  That number was a gross understatement

11 of the amount of money that we have identified flowing into his

12 accounts each week.  It is not 10 times that, it is a hundred

13 times that.

14          THE COURT:  This is his personal accounts, accounts as

15 salary.

16          MS. ALEGRIA:  Into his accounts that he owns and

17 controls.  He made approximately $4.5 million a week in gross

18 earnings.  In August, right before --

19          THE COURT:  I see the suggestion that there was

20 intermingling of accounts.  Just so I'm clear, when you make

21 that representation, are you saying he made that amount gross

22 or his company or companies did?  You need to be perfectly

23 clear.

24          MS. ALEGRIA:  To be perfectly clear, Your Honor, I am

25 including all accounts that have his name on it.

1          THE COURT:  Including as officer of a company.

2          MS. ALEGRIA:  Yes.  Any account --

3          THE COURT:  Let's just say I accept that charge for

4     purposes of argument, but adjust my -- help me understand how

5     that relates to my question, answering my question of what's to

6     support the suggestion that all the accounts have not been

7     frozen, seized, any ability to access significant amounts of

8     money bought.

9          MS. ALEGRIA:  Yes, Your Honor, I'm getting there.

10          So the accounts took in over $600 million in the last

11    three years.  Much of this was withdrawn in cash.  Now, when

12    they were arrested over a million dollars in cash was found in

13    one location, in their home, their residence.  Approximately

14    49,000 was found at the DG Auto Blacey's location, but we have

15    not -- we are unsure of what other cash is out there.

16          We do know, and we learned this after they were

17    arrested, that there was at least one account that was not in

18    their names that had over $300,000 in it, and we only

19    discovered this account because a compliance officer at the

20    bank noticed that the signature cards had their names on it and

21    reached out to us.  And because of that, we blocked their

22    account, but we do not know how much other cash is around, and

23    we do not know how many other accounts, either in the United

24    States or outside of the United States, they have access to

25    that still have funds.

1          THE COURT:  Have you done a back-of-the-envelope

2     calculation?  You said 600 million gross?

3          MS. ALEGRIA:  Yes.

4          THE COURT:  So assuming it costs to operate

5     businesses -- I mean, what's your reasonable -- you are making

6     a representation to the Court that there is a certain amount

7     that you can't account for.  What is that ballpark number?

8          MS. ALEGRIA:  I could not give the Court an estimate

9     at this time.

10          THE COURT:  So, Mr. Eisner, your response to that

11     suggestion that there are perhaps hundreds of millions out

12     there unaccounted for?

13          MS. ALEGRIA:  Your Honor, I have two other things I

14     would like to add to that.

15          THE COURT:  This is on this point of the money?

16          MS. ALEGRIA:  On this point of there being money

17     that's unaccounted for.

18          THE COURT:  All right.

19          MS. ALEGRIA:  Now, we know that in July of 2022, the

20     defendant said that he had approximately $350,000 in BITCOIN.

21     Defendant in his interview with Pretrial Services confirmed

22     that he said that or had around that.  Now, the Government has

23     not been able to find any BITCOIN accounts.  So that's also

24     money unaccounted for.

25          THE COURT:  But as he himself points out now could be

1   worthless.

2       MS. ALEGRIA:  Well, looking up online a BITCOIN

3   calculator, if he kept that amount 350, today it would be worth

4   200.  Yes, it went down a lot, but it's still not zero.

5       And then --

6       THE COURT:  What else?

7       MS. ALEGRIA:  Your Honor, we have heard from sources

8   that there is still funds coming to DG Auto from DG Auto

9   affiliate companies.  These are, like, franchises or otherwise

10  other DG Auto-branded companies that worked with the main DG

11  Auto company in New Jersey, and they work in other states

12  besides New Jersey.  We have heard from these sources that they

13  are engaging in deals that DG Auto New Jersey is brokering, and

14  they are getting a cut of that funding.

15      THE COURT:  This is the new DG Auto the father is

16  supposedly operating?

17      MS. ALEGRIA:  I do not know what account it's been

18  going into, but that would be the Government's current theory

19  is that it's going to the DG Amery account or since this is --

20  this is also a cash-based business.  It could just be cash

21  being funneled to New Jersey.

22      THE COURT:  But you're not -- again, I asked you

23  earlier, are there any other charges you are alleging unlawful?

24  The Court can't speculate.  You know I need concrete details,

25  so rumor is not good enough, but you are suggesting that

1    there's unlawful activity, but it's based on certain people --

2          MS. ALEGRIA:  On confidential sources that I am not

3    going to disclose, Your Honor, sorry, but this is still

4    occurring.

5          THE COURT:  I don't quite know what to do with that.

6    But, Mr. Eisner, on some hundreds of millions of dollars in

7    cash perhaps out there, can you account for the gap that the

8    Government has identified, and also what about the BITCOIN

9    account?  It would be easy to identify that account number.  I

10   mean, that could secure a bond possibly if there really is

11   value and ability to access the BITCOIN at this point.  I don't

12   know if there is.

13         MR. EISNER:  Right.  Thank you, Your Honor.  The

14   Government's mentioned a $600 million figure, that's over a

15   half a billion dollars.  In the under-seal filing, Your Honor

16   was given that number.  I'm assuming we're talking about the

17   same number, it was $545 million that was going through DG's

18   account.  So that's the number we're working on.

19         What the Government did not tell you in that

20   under-seal filing is that this is a business that's based on

21   very, very small margins.  If people receive whatever money

22   they receive, their profit margin, what they take, what they

23   keep after giving the lump sum to the suppliers, is about 2 to

24   2 and a half percent.  That's my understanding.  So I'm doing

25   back-of-the-envelope calculations.

1    If you take $500 million over the course of the last

2    two and a half to three years, but the margins are at two or

3    two and a half percent, you're talking about $3.75 million a

4    year.  I'm not saying that's insignificant, Your Honor, that's

5    a significant fund, but that's a more reliable indication of

6    what the business quote "makes" from this operation.

7    3.75 million is a far cry from the under-seal filing that the

8    Government gave Your Honor of $545 million.

9    You can look at the average daily balance of the

10   accounts.  You could see -- and again, this is buried in

11   hundreds of thousand pages of discovery, which I'm trying to

12   get into, but if you look at the accounts, you will look at

13   when Dewa Auto, that's the people that process the raw

14   material, Dowa, if you see the transfers going into the

15   defendants' accounts, the average daily balance is closer to

16   1.5 million and that the balance never exceeded 2 to 2 and a

17   half million dollars.  I realize we're starting off with a big

18   number, Your Honor, but that is not a reliable indication of

19   the money that this business makes based on the sale and

20   refurbishing of raw materials.  And to be quite frank, Your

21   Honor, I submit that it's an elusory number that the Government

22   is looking to leverage to keep the defendants detained based on

23   speculation that there's money out there somewhere.

24   They seized numerous accounts.  You saw the money that

25   was received at their home.  You saw the cars.  You know, this

1    is not a sophisticated operation.  If there was money out

2    there, Your Honor, you would have been able to find it by now

3    through the Government.

4            THE COURT:  I understand the argument.  What about the

5    BITCOIN account?  That's easy to get to the bottom of, right?

6            MR. EISNER:  Let me just add, the defendants did pay

7    taxes the last three years.  In 2020, they have paid taxes on

8    $1.5 million, and on 2021, they have paid taxes on $3.8 million

9    and that's consistent with the 3.8 million of profit that this

10   business gets.

11           Then in 2022, which they're due to pay taxes, they're

12   due to pay taxes on about that same number, 3.6, 3.7, or 3.8.

13   So my back-of-the-envelope is -- the Government's assertion

14   that this is a $600 million enterprise and there's accounts out

15   there that we don't know about, is just not a fair assessment

16   of what is presented before you.

17           THE COURT:  The Government did say "gross," but why

18   aren't these calculations based on a profit margin fair, Ms.

19   Alegria?

20           MS. ALEGRIA:  Your Honor, I started with gross because

21   that is what defendant alleged to Pretrial, hundred orders of

22   magnitude less than what he was actually getting gross, but

23   more to the point, this back-of-the-envelope calculation on its

24   face does not fly when you consider that almost $3 million in

25   cars alone was seized, as well as the multi-million dollar

1  houses and property.  You just add all of that up and you get

2  to more than what defense counsel's back-of-the-envelope is.

3           THE COURT:  So let me ask you this:  Does the two to

4  two and a half profit margin sound right to you?

5           MS. ALEGRIA:  No, Your Honor, it does not.

6           THE COURT:  What do you think the profit margin is?

7           MS. ALEGRIA:  I do not know what the profit margin is,

8  Your Honor.  There is a lot of this business that was cash that

9  we're still trying to figure out.

10          THE COURT:  You agree it's 545 million over two and a

11  half to three years?

12          MS. ALEGRIA:  Your Honor, that information was based

13  on not-quite-updated financial records.  The financial records

14  have been updated now and it is over 600 million.

15          THE COURT:  For a two-and-a-half to three-year period?

16          MS. ALEGRIA:  Yes, Your Honor, and, for example --

17          THE COURT:  An average daily balance, do you agree the

18  average daily balance showing in whatever discovery documents

19  there are is one and a half to two and a half million?

20          MS. ALEGRIA:  I do not have that information on the

21  top of my head or in front of me, Your Honor.  But, Your Honor,

22  in the last few months alone, just the last three months before

23  they were arrested, it was over $50 million that flowed through

24  these accounts.

25          THE COURT:  That's the gross?

1      MS. ALEGRIA:  Gross.

2      THE COURT:  When would you be able to commit to a

3  profit margin?

4      MS. ALEGRIA:  Well, Your Honor, much of this

5  information -- much of the money that was taken out was taken

6  out in cash.

7      THE COURT:  I understand that.

8      MS. ALEGRIA:  So the question is was that cash used

9  then for their own personal use or was that used to pay off

10  clients?  So how do we calculate whether that cash is part of

11  the business costs or whether it's part of profit and if it is

12  being kept at their home and their business?

13      THE COURT:  Well, again, the Pretrial Services Report

14  says "intermingling."  What about the taxes; do you agree with

15  the numbers counsel provided for the payment of taxes?

16      MS. ALEGRIA:  I do not, again, have those numbers off

17  the top of my head or at my fingertips.

18      THE COURT:  I don't have information on equity in the

19  homes and the other assets, right?  I have raw numbers.

20      MS. ALEGRIA:  Yes, Your Honor.

21      THE COURT:  Were they owned outright; is that the

22  Government's position?

23      MS. ALEGRIA:  Well, for example, Your Honor, their

24  primary residence was owned and paid off entirely by the

25  company DG Auto.

1          THE COURT:  Right, so that's a fair amount of money.

2          MS. ALEGRIA:  And I believe it's in the Pretrial

3     Services Report.

4          THE COURT:  Well, I'm trying to look at a list here,

5     which I've studied some.  Officer Gaskins, do we know the

6     amount of equity in each asset?

7          PRETRIAL SERVICES OFFICER GASKINS:  Yes, Your Honor.

8     It's on Page 5 at the bottom, under Mr. Khanna's assets

9     starting with letter F.  The primary residence was paid off by

10    DG Auto.  The Hanover Drive bought outright.  So it is, Your

11    Honor, encumbered, and the home on Monmouth Road, that was

12    financed and there's money owed on it.  It's likely in

13    foreclosure.

14         THE COURT:  You have the same for the vehicles.  Do

15    all the vehicles have the -- there's value.  If it just shows

16    estimated value, does that mean it's owned in full; for

17    instance, the Porsche Cayman, two-door red, estimated $80,000.

18         PRETRIAL SERVICES OFFICER GASKINS:  Yes, Your Honor.

19    I did indicate whether each one was paid off unencumbered or if

20    there was a payment on it.

21         THE COURT:  So there's nothing indicated that it's

22    paid in full?  I'm looking at BMW, *jj*, estimated $80,000.  Is

23    that owned outright?

24         PRETRIAL SERVICES OFFICER GASKINS:  Those are

25    duplicates, Your Honor, so those are referred to up above, I

1  believe.

2  THE COURT:  It's quite a long list of assets.

3  PRETRIAL SERVICES OFFICER GASKINS:  Yes, it is.

4  THE COURT:  To the extent, the McClaren, 500,000,

5  cash.  That's a lot of money.

6  MS. ALEGRIA:  Yes, Your Honor.

7  THE COURT:  They're assets for which cash was paid.

8  MS. ALEGRIA:  Yes, Your Honor.

9  THE COURT:  I guess my point is the cash went to the

10  assets.  You're not crediting that, that there was a lot of

11  spending on a lot of expensive real estate and fancy cars.

12  MS. ALEGRIA:  I'm sorry, I don't understand the

13  question.

14  THE COURT:  Well, that's one way to trace where a lot

15  of the money went.

16  MS. ALEGRIA:  Yes, Your Honor.  If we can find where

17  the cash goes to, like the McClaren, you could absolutely say

18  that that cash was withdrawn in terms of their profit, not

19  their revenue.  I do not know how they accounted for that in

20  their tax filing.

21  THE COURT:  Well, let me ask Mr. Eisner this:  What

22  about the suggestion of intermingling; what does the Court do

23  with that, that the personal and the business were just

24  freely -- that there was not really regard for formalities,

25  even if taxes were paid; what do I do with that?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

1    MR. EISNER:  It's bad business practice.  I agree with

2    that.

3    THE COURT:  Okay.  Did you ever answer the BITCOIN

4    question?

5    MR. EISNER:  I didn't, I was going to get to that.

6    Your Honor, I understand that the BITCOIN account was seized

7    and that there was a balance of $2,500 in it.  Your Honor, that

8    industry has diminished substantially, and Mr. Khanna says that

9    one of the accounts that were seized is the remnants of the

10   BITCOIN that he once owned, but there's no BITCOIN account out

11   there.  It was an account in Coinbase, and he's happy to

12   provide whatever documentation he can to help the Government

13   track it just like he's disclosed the T.D. Ameritrade account

14   that the Government didn't have in the Pretrial Services

15   Report, but there is no multi-hundred-thousand-dollar account

16   with BITCOIN in it.

17   Your Honor, I just want to --

18   THE COURT:  Let me just ask on the BITCOIN, Ms.

19   Alegria, Mr. Khanna says he believes the digital currency

20   account has been frozen; is that correct?

21   MS. ALEGRIA:  No, Your Honor.

22   THE COURT:  Do you know where to find it?

23   MS. ALEGRIA:  No, Your Honor.  As far as I am aware,

24   the FBI's unaware of what the BITCOIN account number is, has

25   not been able to seize or find any BITCOIN or Coinbase account.

1    MR. EISNER:  Your Honor, my understanding is it's a

2    Coinbase account.  The defendant can access it, and it has

3    $2,500 in it.

4    THE COURT:  Does he have the code to get access to it?

5    Do you have the code, Officer Gaskins?

6    PRETRIAL SERVICES OFFICER GASKINS:  No, I do not, Your

7    Honor.  If I may, I just want to make an initial point which I

8    forgot to mention earlier, and we did not put it in the report.

9    At least I asked Mr. Navin Khanna, "Do you have a CPA?  Do you

10   have an accountant who is working with the business to deal

11   with all this?"

12   It seems logical to try to figure out if there was an

13   accountant who could explain this to us.  They do have an

14   accountant, and I believe defense counsel reached out to them

15   per our request, and possibly on his own, and was referred to

16   their legal department, from what I understand.  I don't want

17   to speak for defense counsel, but that's what I recall.  See,

18   we did try to decipher a lot of the information that Your Honor

19   is asking about without success in that area.

20   THE COURT:  All right.

21   MR. EISNER:  Your Honor, it was over the holiday.  I

22   did call the accountant.  She did reply, or I got a reply from

23   their attorney.  This case is of note in the press.  This case

24   is a concern of everybody involved, and I did get an indication

25   from their attorney that they're happy to give me any

1    information regarding the taxes and the support of it since

2    they're doing the tax return.

3         So it is a bit fluid, but the information that I have

4    that I presented to the Court as far as the taxes have been

5    paid, and they had been working with an accountant over the

6    last four to five years.

7         Your Honor, I asked the Government regarding the

8    profit margin, and the Government said that that's not an

9    accurate number of the profit margin, yet the Government

10   doesn't know what the profit margin is.  So again, I suppose

11   that will be determined, but my understanding of this business

12   is that the funds that -- that got sent to the DG account, they

13   had to pay the suppliers of the product that was either going

14   directly to Dowa or to the company.

15        THE COURT:  I heard you say that.

16        MR. EISNER:  It's a cash business.

17        THE COURT:  I understand that.  Here are my focus

18   questions at this point:  I think I would invite not briefing,

19   but just identifying -- identification of cases that would help

20   the Court get to the bottom of a couple of questions.  One is

21   is there any case law preferably controlling that addresses

22   this issue of the liens on Michael Khanna's home, and does that

23   in any way interfere with the availability of the equity in

24   that home to back a secured bond?

25        Secondly, Ms. Jolly's immigrant status.  Defense

1    counsel makes argument that sounds pretty persuasive to the

2    Court.  I don't think any bond could be effective past the date

3    of her visa.  2025 is when it expires currently, as I

4    understand it, but is there any case law addressing the ability

5    of someone who's here lawfully on a lawful visa to post bond

6    for the period of time that that person is here in the country

7    lawfully?

8          And then my question on Mr. Tinu Khanna, the Pretrial

9    Services Report suggests there is an ICE hold; is that true?  I

10    realize says he's a DACA applicant, but is there an ICE hold?

11          MR. EISNER:  If there was an ICE hold, Your Honor, it

12    is new information to him that must have occurred after

13    November 2, 2022.  I have in my hand the United States of

14    America Employment Authorization card to Tinu Khanna.  He has a

15    license number; it's a card number.  He has a date of birth on

16    this number.  It's valid from 2005 [sic], '21, -- I'm sorry,

17    it's valid from February 5, 2021 to February 4, 2023.  As I

18    stand here today, this is a valid Employment Authorization

19    card.

20          In addition to that, Your Honor, Mr. Tinu Khanna has

21    since applied through DACA to update his status here in this

22    country -- I'm sorry, to renew this authorization card and

23    renew his DACA application.

24          I have in my mind, Your Honor, that they do request

25    information regarding any criminal cases, and Mr. Tinu Khanna

1  disclosed to the question, "Have you ever been arrested,

2  charged with, convicted of a felony or misdemeanor in this

3  case?"

4      He said, "On November 2, the two below allegations

5  have been made.  I, Tinu Khanna, was arrested on

6  November 2, 2022.  Conspiracy to transport stolen property

7  interstate, and two, conspiracy to commit money laundering."

8      THE COURT:  I understand.  I'm not questioning your

9  representations.  Do you have documentation about an ICE hold,

10  Officer Gaskins?

11      PRETRIAL SERVICES OFFICER GASKINS:  No, Your Honor.

12  On Page 14 of Mr. Tinu Khanna's report we indicate there is no

13  reference to an ICE hold.

14      THE COURT:  The language appears to be subject to

15  removal proceedings.

16      PRETRIAL SERVICES OFFICER GASKINS:  Yes.

17      THE COURT:  That caught my eye.  I guess I construed

18  that as suggesting there might be a hold.

19      PRETRIAL SERVICES OFFICER GASKINS:  No, there's no

20  hold.

21      THE COURT:  There's no hold, but ICE shows him subject

22  to removal proceedings.

23      PRETRIAL SERVICES OFFICER GASKINS:  Yes.

24      THE COURT:  So he's not legally in the United States.

25      PRETRIAL SERVICES OFFICER GASKINS:  Correct.

1          THE COURT:  So that has to be cleared up.  Maybe I

2     overstated the matter if there's no ICE hold, and yet that

3     language is concerning that the Court could lose jurisdiction

4     over Mr. Khanna if ICE is taking the position that he's subject

5     to removal.

6          MR. EISNER:  Not legally within the United States.  As

7     of November 2 when he was arrested in this case, he had a valid

8     work permit, and he was valid to be here under DACA.  After

9     that -- and that was to continue until 2023.  Before that date

10    expired, he sought to reapply for another two years the work

11    authorization and his DACA authorization to be here.  He's been

12    here, Your Honor, since he's 13 years old.  Never left this

13    country.

14         THE COURT:  I understand all that.  When does the 2023

15    authorization expire?

16         MR. EISNER:  February 4 of 2023.

17         Your Honor, if something happened between the

18    immigration department after the filing of this case, I don't

19    know.

20         THE COURT:  It's an unanswered question at this point.

21    So I'm going to take the matter under submission.  I do need to

22    know any case law counsel could bring to the Court's attention

23    on the liens issue, on Ms. Jolly's immigration status issue.

24         I'm independently going to look for cases that address

25    this type of case and what amount out of bond is sufficient to

1   secure against flight risk.

2      If counsel has specific cases identifying analogous

3   facts that either sets an amount of bond or sets no amount as

4   the Government argues is sufficient, I just want the case cites

5   with, at most, parentheticals. So you may file as promptly as

6   possible by the end of this week at the latest. A letter

7   simply identifying those cases, and if there's any update on

8   Mr. Tinu Khanna's immigration status, and what this reference

9   means about "subject to removal proceedings," you may provide

10   that, Mr. Eisner, or ask Mr. Kmeto to do that on Mr. Tinu

11   Khanna's behalf.

12      MR. EISNER: I'll do that, Your Honor.

13      THE COURT: My initial instinct, just so I'm being as

14   transparent as possible, is that I don't know the answer to the

15   question of can bond be posted. It may be, but what's being

16   offered is not sufficient in terms of dollar amount or

17   security. That's my initial reaction, but I'm going to --

18   that's my tentative, and I'm going to take the cases you give

19   me and do my own work to try to figure that out. And if I'm

20   able to say in any order, for example, "Release denied, but

21   without prejudice to renewal," I'll be as clear as I can as to

22   what might satisfy the conditions of the Bail Reform Act.

23      So I think that gives me what I need. If there's

24   anything else that doesn't repeat what's already in the

25   briefing or what we've already covered, I will give you just a

1    minute or two.

2          MS. ALEGRIA:  Your Honor, yes, I would like to alert

3    the Court to just a few more facts that have not already been

4    addressed in either the papers or today at the hearing.

5          Defense counsel said that nothing has changed since

6    the day of their arrest.  This is simply not true.

7          THE COURT:  With respect to dangerousness?

8          MS. ALEGRIA:  Yes.

9          THE COURT:  That was his point.

10          MS. ALEGRIA:  Your Honor, when they were released they

11   were ordered very clearly by the Court to not continue to

12   engage in the business of buying and selling and processing

13   catalytic converters.  The day after they were released,

14   November 3, an HSI agent observed both Tinu Khanna and Lovin

15   Khanna go into their DG Auto at Blacey's, go into the office

16   and spend six hours there.

17          Your Honor, I have also heard from a witness who has

18   expressed fear of these two brothers.  Such as going -- Your

19   Honor, it appears that this DG Amery Tech Company, which was

20   mentioned by Pretrial Services, is still paying the DG Auto

21   employees.  And we have also heard from sources, as I mentioned

22   already, that they're engaging in third-party brokerage deals.

23   So, Your Honor, it does seem that they have been violating the

24   orders of the Court to not engage in the business of buying and

25   selling catalytic converters.  So I just wanted to make the

1    Court aware of that new information.

2            THE COURT:  Well, these defendants haven't been -- are

3    you suggesting they've been operating the business from their

4    jail cells?  Pretrial Services says other family members are

5    carrying on a business in an effort to keep paying the same

6    employees.

7            MS. ALEGRIA:  Yes, Your Honor.

8            THE COURT:  So it's these defendants that are facing

9    the current proceedings.

10           MS. ALEGRIA:  And these defendants spent almost an

11   entire day at their DG Auto business the day after they were

12   released and ordered to no longer engage in that business of

13   buying and selling catalytic converters.

14           THE COURT:  And they were not supposed to go to the

15   officers at all?

16           MS. ALEGRIA:  They were not ordered from the premises,

17   Your Honor, but -- and I don't know what they did on their

18   computers at that office, but they were there for six hours.

19           THE COURT:  All right.  Mr. Eisner, anything further?

20           MR. EISNER:  Do you want me to respond to that, Your

21   Honor?

22           THE COURT:  It's up to you.  It's just to make a

23   record now.  It's the first I've heard it.  There is talk about

24   DG Amery and the father trying to -- I mean, that information

25   is in the Pretrial Services Report, so I reviewed that.

1      MR. EISNER:  This family, Your Honor, is trying to

2  survive.

3      THE COURT:  I understand that's the defense position.

4      MR. EISNER:  This was their business.  On a certain

5  date the Government came, seized all their property, arrested

6  them, seized all their bank accounts.  They had an ongoing

7  business.  The employees needed to be paid.

8      You know, this is a situation where they tried --

9  well, if the family is doing anything now, Your Honor, it's

10  simply trying to survive, to keep employees.  This is not the

11  only business that they did.  They're also in the junkyard

12  business.  They're mindful of the admonition not to engage in

13  the purchase or sale of any stolen materials.  They're mindful

14  not to operate DG Auto.  If there is a company that's paying

15  employees $15 an hour in order to keep the roof over their

16  heads, perhaps they plead guilty to that, Your Honor, but this

17  is not an operation that the Government is -- the depth of

18  which the Government is conveying to you.

19      THE COURT:  All right.  The matter is submitted.  Once

20  I get your filings, let's say by Friday at noon, I will then

21  issue an order as quickly as possible making a decision, but I

22  am taking the matter under submission.  I need to think about

23  what I heard today and whatever case law you bring to my

24  attention.

25      THE COURT:  Thank you very much.  We're going to take

1      a recess before we call the next matter.

2              MS. ALEGRIA:  Thank you, Your Honor.

3          (Proceedings adjourned at 2:30 p.m.)

4

5                      C E R T I F I C A T E

6

7          I certify that the foregoing is a true and correct

8      transcript of the of proceedings in the above-entitled matter.

9

10     _____          1/19/2023
11     MARYANN VALENOTI, RMR, CRR                     DATE
       Official Court Reporter
12     CA CSR #11266

13

14

15

16

17

18

19

20

21

22

23

24

25