UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, | No. 2:22-cr-00213-KJM |
| Plaintiff, | ORDER |
| v. | |
| Navin Khanna, et al., | |
| Defendants. | |

The government moves to revoke prior pretrial release orders issued in New Jersey with respect to defendants Navin Khanna and Tinu Khanna. Each defendant requests pretrial release. As explained below, on the present record the court finds no set of conditions could reasonably assure defendants' appearance. The court therefore **grants** the government's motion and **denies without prejudice** defendants' motions.

**I.      BACKGROUND**

In October 2022, defendants Navin Khanna and Tinu Khanna, alongside seven other individuals, were indicted on charges of a conspiracy to transport stolen catalytic converters across the United States. *See generally* Indictment, ECF No. 1. Defendants were indicted on six of the forty counts in the indictment: for each defendant, on one count of conspiracy to transport stolen property interstate in violation of 18 U.S.C. § 2314, and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h); for defendant Navin Khanna, on four

1

counts of transporting stolen property interstate in violation of 18 U.S.C. § 2314, *id.* at 24.[1]  The indictment also includes a forfeiture allegation against all defendants.  *Id.* at 26.

By way of background, catalytic converters are "a component of an automotive vehicle's exhaust device that reduce the toxic gas and pollutants" from a car's engine.  *Id.* at 2.  The U.S. Environmental Protection Agency requires catalytic converters in all cars with internal combustion engines.  *Id.*  Each state sets its own emission standards for catalytic converters, which in turn dictate the concentration of different metals in the catalytic converter.  *Id.*  The higher the emission standards, the higher the concentrations of precious metals.  *Id.*  For states like California that set relatively high emission standards, the catalytic converters in the state contain relatively high concentrations of precious metals.  *Id.*  Because these catalytic converters contain precious metals but lack identifying characteristics, they have become "increasingly popular" for theft.  *Id.* at 3.  However, the process to remove precious metals from catalytic converters is complex.  *Id.*  As a result, they often are sold intact to an extraction company, which can remove these precious metals and sell them to a metal refinery.  *Id.* at 3–4.

According to the indictment, defendants helped coordinate multiple shipments of stolen catalytic converters from California to New Jersey.  *Id.* at 4.  They ran a catalytic converter recycling company in New Jersey, called DG Auto, where they removed precious metals from catalytic converters, as well as purchased stolen "bricks" of precious metals and sold them directly to a metal refinery.  *Id.* at 6.  They also operated a digital platform providing real-time pricing information for individuals planning to steal catalytic converters, including DG Auto's price "for a specific catalytic converter on that date, which would change based on the market rates for the precious metals."  *Id.*

The indictment details a significant number of transactions between defendants and their alleged co-conspirators for shipping stolen catalytic converters from California to New Jersey.  *See id.* at 7–13.  For example, DG Auto bank account statements show more than $36 million sent to a co-conspirator's bank account in less than two and a half years.  *Id.* at 13.  In total, between

---

[1] Pagination refers to those page numbers applied by the CM/ECF system.

2

July 2019 and June 2022, defendants received approximately $545 million from the metal refinery for the bricks and other precious metals extracted from catalytic converters. *Id.* at 14.

In November 2022, after their arrest in New Jersey, defendants made their initial appearance before a U.S. Magistrate Judge in the federal district court for that state, and the court ordered pretrial release for each on an unsecured bond. Mot. for Bond at 2, ECF No. 80. The government sought an untimely stay of the release order, which the New Jersey court denied. *Id.*; *see also* Calcagni Decl., ECF No. 80-1. The next day, the government filed a motion to stay the New Jersey release order in this court without disclosing it had untimely requested and been denied a stay before the New Jersey court.[2] *See* Mot. for Stay, ECF No. 16. The court granted the stay and ordered the U.S. Marshals Service to promptly transport defendants to the Eastern District of California. *See* Prior Order (Nov. 3, 2022), ECF No. 22. Before defendants' rearrests based on this court's orders, it appears they were released and remained in New Jersey from November 3rd through 9th.

The government's motion to revoke the New Jersey release order claims pretrial detention is necessary because no conditions can reasonably assure defendants' appearance at future proceedings and the community's safety. Mot. to Revoke, ECF No. 17. Defendants move for bond, arguing their strong ties to the United States and the seizure of substantial assets ensure they will return to court, and noting there are no allegations they have engaged in violence. *See* Mot. for Bond; Joinder, ECF No. 84. On January 10, 2023, the court held a hearing on the parties' motions. *See* Hr'g Mins., ECF No. 108. Veronica Alegria represented the United States, and Alan Eisner appeared for defendant Navin Khanna (NK) and also specially appeared on behalf of Peter Kmeto for defendant Tinu Khanna (TK), with the latter's consent. Both defendants were present and in custody. The assigned Pretrial Services Officer recommended the court deny release, concluding based on her investigation supplementing the New Jersey court staff's initial evaluation that no set of conditions could reasonably assure defendants' appearance.

---

[2] The court admonished the government for this nondisclosure at the motion hearing on January 10, 2023, and directed the government to ensure full disclosure of such pertinent information in the future.

3

The Pretrial Services Officer also stated in her report she has no information indicating any danger to the community. At the end of the hearing, the court granted the parties leave to submit notices of relevant case law on certain contested issues regarding defendants' proposed sureties.

Defendants filed supplemental briefing, outlining relevant cases and identifying new sureties for bond. *See* NK Suppl. Br., ECF No. 111; TK Suppl. Br., ECF No. 112. Defendant Navin Khanna proposes a bond in the amount of $300,000, secured by the residence of Kamaljit Badwal and Jaswinder Badwal,[3] who are his brother-in-law and sister-in-law. NK Suppl. Br. at 3. Defendant Tinu Khanna proposes a bond in the amount of $250,000, secured by the residence of Michael Khanna, an older brother of his and Navin Khanna. *Id.* Defendants note an additional unsecured bond could be posted in the amount of $100,000 for either defendant, or $50,000 for each defendant, by Sapna Jolly, a long-time family friend.

The government filed an untimely response to defendants' filing, identifying relevant cases, responding to defendants' supplemental briefs, and offering new information about defendants' financial status, which the government argues increases their flight risk. *See* Gov't Letter, ECF No. 116. In particular, the government represented it had identified $22 million in unaccounted cash based on a financial analysis conducted after the hearing before this court, as well as a foreign bank account in India tied to defendants' father. *Id.* Although the court noted the lateness of the government's reply, it issued an order explaining it would consider the reply's contents and granting defendants' leave to file a response. Min. Order (Jan. 17, 2023), ECF No. 118.

Navin Khanna timely responded, challenging the government's "missing cash" argument as unsupported by record evidence and arguing un-invoiced purchases could explain the shortfall; he also argues even a large amount of cash, if a factor, does not render detention necessary. *See* Resp., ECF No. 119. Navin Khanna further argues his father's partnership in an Indian company with an Indian bank account does not show Navin is involved in the company, nor that he has

---

[3] A defense filing spells Jaswinder's last name as both Badwal and Badwall. *See, e.g., generally* ECF No. 111. In this order the court adopts the spelling identical to that of Kamaljit's last name.

4

access to its assets; he provided the Indian bank account's statements, which indicate a relatively small balance. *See id.* The next day, the government filed an unauthorized submission with a half dozen new exhibits, identifying cash withdrawals from DG Auto bank accounts totaling more than $27 million in unaccounted cash over a period of less than three years. *See* Reply, ECF No. 120. The government argued this significant amount of cash could not be tied to any identified purchases or assets, other than the $1 million in cash found in defendants' home at the time of arrest. *See id.*

Although the government's submission was unauthorized, in light of its apparent relevance, the court issued a further order stating it would consider the contents and granting defendants leave to file a further response, while warning the government future unauthorized or untimely filings may be disregarded. Min. Order (Jan. 19, 2023), ECF No. 122. Navin Khanna timely replied, arguing in part that the unaccounted-for cash is a result of mislabeled invoices and providing one such example. *See* Reply, ECF No. 124. Navin Khanna also noted, with $600 million in invoices during the relevant period, "negligent accounting practices could account for a $26 million discrepancy." *Id.* at 2. The motions are now submitted.

## II.     LEGAL STANDARD

Under the federal Bail Reform Act, 18 U.S.C. §§ 3141, *et seq.*, persons charged with offenses must be released pending trial unless "such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). "Only in rare cases should release be denied." *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990). As a result, the court denies release only when it finds "no condition or combination of conditions will reasonably assure" the person's appearance or the safety of any other person and the community. 18 U.S.C. § 3142(e).

The Act provides several factors the court must consider: (1) the nature and circumstances of the charged offense, (2) the weight of the evidence, (3) the history and characteristics of the person, and (4) the nature and seriousness of the danger to any person or the community posed by release. *See* 18 U.S.C. § 3142(g); *see also United States v. Motamedi*, 767 F.2d 1403, 1407 (9th Cir. 1985). "On a motion for pretrial detention, the government bears the burden of showing by a

preponderance of the evidence that the defendant poses a flight risk, and by clear and convincing evidence that the defendant poses a danger to the community." *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991).

The factors vary in significance. At one end, "the weight of the evidence is the least important of the various factors," as pretrial detention does not turn on the person's potential guilt and the presumption of innocence is fully preserved. *Motamedi*, 767 F.2d at 1408. At the other, courts pay close attention to a person's history and characteristics. *See Gebro*, 948 F.2d at 1121–22. Ultimately, whether proposed conditions of release address the relevant risk factors can be dispositive. For example, an insufficient bond amount could be dispositive against a defendant if the court determines the flight risk is "too great" without that bond amount. *United States v. Fidler*, 419 F.3d 1026, 1028 (9th Cir. 2005) (quoting *United States v. Jessup*, 757 F.2d 378, 389 (1st Cir. 1985)).

### III.  ANALYSIS

At the outset, the court finds pretrial release of defendants would not pose a danger to the community. They are charged with economic crimes only. Defendant Navin Khanna has no violent criminal history, *see* Mot. for Bond at 4, and defendant Tinu Khanna has no criminal record at all, *see* Joinder at 2. The indictment contains no allegations of violence by defendants. The government's general allegations of violence associated with catalytic converter theft are too remote to satisfy the clear and convincing standard that defendants would pose a danger to the community if released. *See* Mot. to Revoke at 6–7 (citing shootings related to catalytic converter theft in Minnesota and Texas, but unrelated to these defendants' specific conduct). Moreover, the government's general allegations that defendants' economic activities drive a violent market are unpersuasive in light of the lack of evidence fully supporting the conclusion that this particular market is steeped in violence or defendants could at this point continue to run their catalytic converter business if released. When pressed at hearing, the government was unable to point to any evidence that defendants' alleged catalytic converter operation is ongoing.

The court thus finds conditions prohibiting defendants from participating in specified businesses would be sufficient to mitigate the risks identified by the government. The fourth

1  § 3142(g) factor—the nature and seriousness of the danger to any person or the community posed
2  by release—thus favors release.  The court considers the other factors and potential conditions of
3  release in considering whether defendants pose a flight risk and whether such a risk can be
4  addressed through pretrial release conditions.

        **A.**     **Nature and Circumstances of Offense and Strength of Evidence**

6         The court considers the "nature and circumstances of the charged offense" and "the
7  weight of the evidence" together.  18 U.S.C. § 3142(g).  Defendants do not address the
8  seriousness of the charged offense nor the weight of the evidence, *see* Mot. for Bond; Joinder,
9  although the weight of the evidence is the least important factor, *see Motamedi*, 767 F.2d at 1408.
10 In contrast, the government emphasizes the seriousness of the charged offense.  *See* Mot. to
11 Revoke at 6.  Defendants are charged with "operating a sophisticated national criminal
12 enterprise" spanning the country."  *Id.*  Catalytic converter theft is "a scourge of this community,"
13 which disproportionately affects California, imposes a financial burden on individuals and is
14 linked to violent crime.  *Id.*  Defendants allegedly grossed over $600 million from selling stolen
15 catalytic converters and catalytic bricks.  Even if defendants' profits were two or three percent of
16 the gross, as defendants argued during the hearing, defendants still would have made millions of
17 dollars through this enterprise.  A national conspiracy to steal hundreds of millions of dollars of
18 essential vehicle components from community members is a significant charge.  The court thus
19 finds the charged offense is serious.
20         The government also urges the court to find the evidence against defendants is strong.  It
21 points to recordings of defendants during multiple transactions of purportedly stolen catalytic
22 converters and catalytic bricks, as well as "Facebook records, shipping manifests, DG AUTO
23 invoices, and financial documents," bolstered by physical evidence seized from defendants' home
24 and businesses.  *Id.* at 7.  The government directs the court to Exhibit A, *see id.*, which is filed
25 under seal and corroborates the government's summary of the evidence, *see* ECF No. 41.
26 Although defendants' silence regarding this evidence does not weigh against them, the court
27 nevertheless finds the government's summary, which is credible in light of Exhibit A, shows by a
28 preponderance of the evidence that the weight of the evidence favors detention.

**B.     History and Characteristics of the Person**

Although this order resolves defendants' bond requests together because they are presented jointly, the court carefully considers each defendant's individual history and characteristics. Accordingly, it analyzes them separately here.

**1.     Navin Khanna**

Navin Khanna argues he has "strong ties" to the United States. Mot. for Bond at 3. The court mostly agrees with this characterization. His wife of 11 years, his 10-year-old son, his parents and two brothers all reside in New Jersey. *Id.* He is a U.S. citizen, and law enforcement has seized his passport, limiting his ability to travel outside the country. *Id.* at 3–4. He claims all his financial assets have been seized, leaving him without the means to make international travel plans. *Id.* at 4. Moreover, at oral argument, he contested the government's representation he made over a half billion dollars; he claimed the business's profit was two to three percent of the gross, resulting in an overall net of around $10 million.

In response, the government notes Navin Khanna was born in India, maintains ties there, speaks Hindi and asserts he is "highly likely" to flee the U.S. to avoid prosecution. Mot. to Revoke at 7. The government disagrees with his assertion that he has no means to flee. *Id.* At oral argument, the government stated DG Auto's books have shown over $600 million in gross revenue, and as noted, the government believes "over $26 million [in cash] cannot be traced." *See* Reply at 1, ECF No. 120. Over eighty pages of financial records detail this allegedly missing cash over a nearly three-year period. *See* Exs. C, D, E, F, G & H, Reply, ECF No. 120. For example, between January 1, 2022, and October 27, 2022, DG Auto paid for invoices with approximately $33 million in cash, *see* Ex. G, Reply, ECF No. 120-5, but it withdrew over $50 million in cash from its bank accounts, *see* Ex. H, Reply, ECF No. 120-6.

After careful review of the financial information, the court finds the government's conclusion about the missing cash is consistent with the overall record before the court. Although Mr. Khanna claims the unaccounted-for cash is a result of mislabeled invoices, he provides only one example of a mislabeled invoice, in the amount of $300,000. *See* Invoice, ECF No. 124-1. While the court understands a full forensic audit may be required to demonstrate whether the

defense characterization of the record holds up, a single invoice at this point does not overcome the significant concerns raised by the financial records that are available.  Moreover, while defendants possessed luxury cars valued at a minimum $3.5 million at the time of their arrest, these substantial assets—now seized--do not account for the more than $26 million in unaccounted-for cash to which the government points.

Weighing Mr. Khanna's personal history presents a close call.  On the one hand, although the government emphasizes Mr. Khanna's ties to India, the Ninth Circuit has clarified alienage alone does not show a serious risk of flight, *see Motamedi*, 767 F.2d at 1408, and in any event, Mr. Khanna is a U.S. citizen with a spouse, young child, parents and siblings in this country. Mr. Khanna also emphasizes he did not flee after being released in New Jersey, but instead chose to remain at his New Jersey residence.  Reply at 1, ECF No. 124.  On the other hand, *Motamedi* is factually distinguishable in ways that highlight an increased flight risk in this case: there, the defendant was forced to flee Iran after the fall of the Shah, all his assets were seized after the fall and he was not free to return to Iran.  *Id.*  In contrast, here, notwithstanding the pending criminal charges, Mr. Khanna presumably could decamp to India, and the government's identification of $26 million in unaccounted cash credibly suggests not all his assets have been seized.  In addition, Mr. Khanna's father, who also resides in the U.S., maintains business interests in India, which includes at least one Indian bank account.  *See* Gov't Letter at 2; Bank Letter, Gov't Letter, ECF No. 116-1.  Moreover, the court notes both defendants told Pretrial Services their only tie to India was one grandmother there.  As a result, the information about the father's business interest —whatever its value--appears inconsistent with that report, casting doubt on the reliability of defendants' self-reported minimal ties abroad.  Although Mr. Khanna's ties to India alone do not weigh in favor of detention, when combined with possible ease of access to banks in India and the $26 million in unaccounted-for cash, the court finds by a preponderance of the evidence that Mr. Khanna's individual history and characteristics contribute to a serious risk of flight.

**2.     Tinu Khanna**

Tinu Khanna emphasizes his personal history is "distinct from his brother."  Joinder at 2.  He immigrated to the United States from India with his family in 2000, when he was 13 years old.

9

*Id.* Although he is not a U.S. citizen, he has a U.S. work visa and has applied for status under the federal program known as Deferred Action for Childhood Arrivals (DACA). *Id.* The court assumes for the sake of this order that Tinu Khanna is in this country legally. He no longer has a valid Indian passport because it expired. *Id.* At oral argument, his attorney stressed his strong desire to remain in this country. Considering this personal history, he argues he is not a flight risk because (1) he has been a U.S. resident for 22 years; (2) his immediate family members live in the U.S.; (3) he has no means to flee; and (4) he did not flee during his short release from custody. *Id.* at 3.

The government disagrees, and points out Mr. Khanna was born in India, has ties there, speaks Hindi and is not a U.S. citizen; it thus argues he is "highly likely to flee." Mot. to Revoke at 7. Further, as discussed above, the government relies on its financial analysis to conclude over $26 million in unaccounted cash available to both defendants increases their flight risk. *See* Gov't Letter; Reply.

Although the court agrees Tinu Khanna's personal history is distinct from his brother's, the court finds by a preponderance of the evidence he also poses a serious flight risk in light of his ties to India and apparent access to substantial amounts of unaccounted-for cash. Moreover, unlike Navin Khanna, Tinu Khanna does not have a spouse and child in the country. While on the one hand he remained here following his release in New Jersey and he has incentives to remain in this country and obtain DACA status, he has a fiancée who lives in England; while she attended his detention hearing, her ability to travel here and her residence outside the country also raises concerns. For all these reasons, the court concludes Mr. Khanna's personal history poses a serious flight risk.

### C. Conditions of Release

Although the court has found defendants' release would pose a serious flight risk, defendants must still be released if any condition or combination of conditions would reasonably assure their appearance. 18 U.S.C. § 3142(e); *see United States v. Hir*, 517 F.3d 1081, 1092–93 (9th Cir. 2008). Defendants urge, even if a significant amount of cash is unaccounted for, conditions could eliminate flight risk. First, defendants claim they have identified sufficient

amounts of bond. As noted, Navin Khanna proposes a bond in the amount of $300,000, secured by Kamaljit Badwal and Jaswinder Badwal's residence. NK Suppl. Br. at 3. Tinu Khanna proposes a bond in the amount of $250,000, secured by Michael Khanna's residence. *Id.* Defendants note an additional surety of $100,000 could be posted for either defendant, or $50,000 could be posted for each, by Sapna Jolly. Second, Navin Khanna proposes "home confinement enforced by electronic GPS monitoring with exceptions only for medical emergencies and legal visits." Reply at 3, ECF No. 119. Taking these conditions together, defendants argue the alleged unaccounted cash should not weigh disproportionately against them because they do not have access to current passports and they offer secured liens against the homes of persons close enough to them that they would not abscond and leave them to forfeit the amounts of bond. *See id.* at 2; Joinder at 3.

The government argues defendants' proposed bond amount is insufficient in light of the unseized assets. *See* Gov't Letter at 3–4; Reply at 1, ECF No. 120. It posits an amount "close to $26 million" would be the only amount of bond that would ensure appearance. Reply at 2. The government primarily relies on *United States v. Szott*, 768 F.2d 159 (7th Cir. 1985) (per curiam). There, the Seventh Circuit rejected defendant's argument that the district court's setting bail at $1 million in cash was excessive when the offense involved $2.6 million and the defendant had no ties to the community. *Id.* at 160. In large part, the defendant's appeal was predicated on his claim he could not afford the bail amount. *Id.* As the defense points out, *Szott* is distinguishable on many grounds, including that this court is not considering setting bail at an amount defendants could not afford to pay and defendants here have significant ties to their home community.

Nonetheless, the court agrees that bonds secured by $250,000 or $300,000 in equity in a family member's home are insufficient in light of the strong evidence that $26 million in cash is unaccounted for. While the government's requested bond appears to be excessive, the court finds defendants' explanations of the cash discrepancies in DG Auto's records insufficient, given the sole example of a mislabeled invoice. Considering the significant amount of unaccounted-for cash, an additional $50,000 or $100,000 bond secured by Sapna Jolly is not enough to assure defendants' future appearance. In reaching this conclusion, the court also has carefully

11

considered the recommendation of the Pretrial Services Officer and finds it supported by all of the information available to the court at this time. While defendants' remaining in New Jersey for several days following their release from federal court weighs in their favor, they must do more to gain release here.

In sum, the court finds the government has met its burden to show by a preponderance of the evidence no combination of conditions can reasonably assure either defendant's appearance.

### IV.   CONCLUSION

The court **grants** the government's motion to revoke the prior release orders and **denies without prejudice** the motion for bond by defendants Navin Khanna and Tinu Khanna.

This order resolves ECF Nos. 17, 80 and 84.

IT IS SO ORDERED.

DATED: February 22, 2023.

CHIEF UNITED STATES DISTRICT JUDGE